## M.J. Daly & Sons, Inc. v. City of West Haven

### CV 960053211S

### SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF ANSONIA - MILFORD, AT DERBY

*1999 Conn. Super. LEXIS 2573*

September 24, 1999, Decided
September 24, 1999, Filed

**NOTICE:** [*1]   THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**SUBSEQUENT HISTORY:** Motion for Reconsideration of December 3, 1999, Reported at: *1999 Conn. Super. LEXIS 3241*. Motion to Reopen Granted February 4, 2000, Reported at: *2000 Conn. Super. LEXIS 298*.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**JUDGES:** George W. Ripley, III, Judge Trial Referee.

**OPINIONBY:** George W. Ripley, III

**OPINION:** Memorandum Of Decision

The plaintiff in this matter is a Waterbury-based construction company M.J. Daly & Sons, Inc. which has been in business for a number of years engaging in municipal work including pumping stations as well as specialized industrial work. In March 1992 the defendant City of West Haven advertised for bids to construct a main pumping station in connection with the City's sewage disposal system. The necessity for this came about apparently as a result of a lawsuit by the State of Connecticut against the City which ended with a stipulated judgment requiring the City to upgrade its system. There were originally 3 areas of work encompassed within the City's plans and specifications consisting of:

  (1) above grade activity including replacement of electrical switching equipment;

  (2) removal and replacement of existing pumps and piping and;

  (3) some structural modifications.

The bid submitted [*2] by Daly in the amount of $ 998,452 was accepted by the City with the executed contract calling for completion within 365 days with the period of construction running from March 30, 1992 to March 31, 1993. (P. Ex. 3A.) The engineering firm of Cascio-Bechir had been previously selected by the City to be its engineers supervising the project. Problems interfering with Daly's performance of the contract arose almost immediately on the project and substantial delays were experienced resulting in considerable extra costs through the project and dissension between the parties. This dissension continued throughout the plaintiff's attempted performance of the contract until June 3, 1996 (D. Ex. 49) when the City elected to terminate the contract short of completion, which termination became effective 10 days thereafter; i.e. June 13, 1996.

Among the major problems experienced were the immediate discovery of an underground structure not shown on the plans which prevented Daly from doing any initial excavating to get the project under way. Later it was discovered that

the force main running from the pumping station to the Water Pollution Control Plant (WPCP) was made of asbestos cement which [*3] prohibited its continued use and a parallel force main was required to be installed. This brought about a cessation of work while the City's engineers prepared plans and specifications to cover that construction. Another major problem arose when the City and its engineers Cascio-Bechir parted company around December 1994 requiring the introduction of a new engineering firm, namely Black & Veatch. The problems created by these events and others and the inability of the parties to reach an amicable financial resolution resulted in the termination of the contract by the defendant. As a result, Daly filed this action on January 31, 1996 consisting of six counts seeking money damages, interest, attorneys fees and punitive damages.

The First Count of the complaint sets out in some 44 paragraphs the terms of the contract as relating to the problems which arose, the factual allegations of the plaintiff giving rise to the claims of damages resulting from delays allegedly caused by the City and extra costs brought about by change orders and the unanticipated failure of existing pumps requiring bypass pumping on an emergency basis.

The Second Count claims damages allegedly incurred [*4] by Daly for home office expense and overhead incurred as a result of the delays caused by events set out in the First Count.

The Third Count claims a lack of good faith and fair dealing by the defendant in its handling and resolution of Daly's claims under the contract.

The Fourth Count grounded in negligence claims damages based upon the City's failure to provide accurate plans for the project and its failure to seasonably act on problems encountered during the course of the construction.

The Fifth Count claims negligent misrepresentations and omissions on the part of the City as to the City's obligation to compensate the Plaintiff for extra work performed to complete the project.

The Sixth and final count concerns additional expenses incurred by the plaintiff in construction with the bypass pumping which the defendant agreed to assume initially but according to the plaintiff apparently never intended to pay constituting intentional misrepresentations upon which the plaintiff relied to its loss and damages.

The defendant under date of March 1, 1999 responded to the plaintiff's complaint with its answer and several special defenses.

The First Special defense [*5] claims an accord and satisfaction by way of change orders for various agreed amounts and costs of delays through May 25, 1995.

The Second Special Defense claims an accord and satisfaction by an agreed change order for all claims arising out of work performed at the WPCP as well as bypass pumping connected therewith.

The Third Special Defense claims that any work performed by the plaintiff in connection with the emergency bypass pumping is not compensable under the terms of the contract because of Daly's failure to proceed under the contract terms as regards work to be performed on an emergency basis.

The Fourth Special Defense again alleges lack of compliance with terms of the contract and as a result such claims are barred.

The Fifth Special Defense alleges that under the terms of the contract the parties agreed that the engineer selected by the City was to resolve any disputes arising under the contract and that determination by the engineer was a prerequisite to any civil action. Under the contract terms relating to termination, the City determined what was due and owing under the contract and since Daly refused to participate in determining the final amount [*6] due under the contract, Daly is deemed to have accepted such amount and is accordingly barred from pursing this action.

The City, by way of counterclaim setting forth Daly's failure to abide by the contract terms regarding the engineer as the arbiter, requests this court to adopt the amount due the plaintiff as determined by the defendant and enforce the award as final and binding on the parties.

2

The court heard the evidence as presented by the parties over a period of 6 weeks and consisting of several hundred exhibits and approximately 2000 pages of transcript.

The court will first take up the defendant's several special defenses as they relate to the barring of any of the plaintiff's claims under the terms of the contract.

The defendant's five special defenses can be divided into two subject areas: accord and satisfaction (the first and second special defenses), and arguments based on the contract (the third, fourth and fifth special defenses). In its accord and satisfaction special defenses, the defendant maintains change orders (CO) one through seven redress all of the plaintiff's claims and thus the claims are barred by the doctrine of accord and satisfaction [*7] from being reconsidered. In its contract special defenses, the defendant argues that the plaintiff's claims are barred by the contract as the plaintiff has failed to submit his claims to the engineer as required pursuant to the contract and, moreover, that the engineer's final decision addressing any outstanding disputes is final and binding on all parties involved.

As to the defendant's first two special defenses, the court finds that the plaintiff's present claims are not barred through a previous discharge of the debt by way of accord and satisfaction.

> To prove an accord and satisfaction, the defendant must show that at the time of the agreement there was a good faith dispute over the existence of a debt or over an amount owed, and that the debtor and the creditor negotiated a contract of accord to settle the claim . . .

(Citations omitted.) *Munroe v. Emhart Corp.*, 46 Conn. App. 37, 42, 699 A.2d 213 (1997).

> The proponent must be able to show that there was a meeting of the minds, and that the offer by the debtor was *clearly* tendered as full satisfaction of the debt and that the payment was knowingly accepted.

*Id.* (emphasis [*8] added).

In the present case the defendant has not met his burden of proving an accord and satisfaction in several aspects. For one, there is no evidence to suggest that all of the change orders were contemplated as a settlement of a good faith dispute over the existence of a debt or an amount owed. Change Orders One (P. Ex. 60) (reflecting additional costs necessitated by the need to construct a new 30 inch force main) and Two (reflecting additional costs for the removal of an underground structure), for instance, do not involve a disputed amount, but rather reflect amounts to be paid by the defendant for additional work unanticipated in the original contract. They are amendments to the contract and do not reflect a conscious effort to settle any previously disputed sum.

The additional change orders cited by the defendant arguably concern a disputed amount. CO # 6 (P. Ex. 62) for instance, owes its existence to an attempt by the parties to cover costs associated with various delays and other amounts claimed by the plaintiff. Even so, the defendant has failed to show that there was a meeting of the minds between the parties concerning these change orders so as to constitute [*9] a proper accord and satisfaction. That is, the court is of the opinion that the defendant has failed to show that the change orders executed to cover certain delays included *all* of the plaintiff's possible claims and therefore extinguished all future rights. As noted in *Munroe*, the evidence must be clear on its face for the court to reach such a definitive conclusion. See also *Peerless Soda Fountain Service v. Savin*, *117 Conn. 1, 4, 166 A. 386 (1993)*. CO # 6 is an example where it is evident that, for purposes of a total accord and satisfaction, a meeting of the minds between the two parties did not occur. Thus, while CO # 6 contains a wide ranging list of items included in that settlement, it does not mention certain aspects (such as "soft costs" or the New England Railroad claim discussed below) even though the parties were certainly aware of them and reasonably could have included them in CO # 6 at that time. Rather, the calculation of these items according to the plaintiff was to be preserved for a later time. The fact that CO # 6 is silent as to the plaintiff's remaining and/or future rights gives further support to the plaintiff's contention that the [*10] change orders were not an accord and satisfaction discharging all present and future claims.

The court, accordingly, finds that the plaintiff's claims are not barred by the special defenses of accord and satisfaction.

3

The court will now address the remaining special defenses, dealing with the plaintiff's failure to submit claims to the project Engineer despite contractual provisions requiring that it do so as set out by the defendant in its third and fourth special defenses. The court will also address the defendant's special defense that the Engineer's decision concerning any outstanding claims is final and binding.

Concerning these special defenses, the defendant argues that contractual provisions (P. Ex. 3b Sec. 9.11, 9.12) require that the plaintiff submit all disputed claims as to contract documents and work acceptability to the project engineer who serves as an interpreter and judge between the contract parties. The defendant maintains that the plaintiff's failure to do so now bars the plaintiff from seeking any remedies in a manner contrary to the express provisions of the contract.

The plaintiff, however, argues that the contractual provisions cited by the [*11] defendant are no longer applicable because there has been no project engineer since prior to the time when the disputed claims occurred. The plaintiff claims that the original engineer, Cascio-Bechir, was terminated by the defendant and that the plaintiff never approved, and in fact objected to, Cascio-Bechir's replacement, Black & Veatch, as the project engineer. The plaintiff thus argues that there was no project engineer to whom to submit any claims, thereby nullifying any contractual obligations. Additionally, the plaintiff claims that the contract provides that disputes be referred to the municipality and consequently the plaintiff claims a conflict on this issue.

The evidence gathered at trial leads the court to conclude that the plaintiff did not act unreasonably, and did not breach the contractual provisions, by not submitting any claims to Black & Veatch. The court agrees with the plaintiff that the evidence from the trial is consistent with the plaintiff's argument that it accepted Black & Veatch only as an agent of the defendant and never as the project engineer. See plaintiff's post-trial brief of June 18, 1999, p. 71.

In case of a need to change engineers, the [*12] contract between Daly and West Haven called for the City to name a new engineer. See plaintiff's exhibit 3b, Sec. 8.2. The plaintiff, however, was given the right to object to the defendant's choice. In the present case, the plaintiff, citing Black & Veatch's unfamiliarity with the project, did object to the appointment. See D. Ex. 48, P. Ex. 53. During this time, the specific role that Black & Veatch was to fulfill remained unspecified and questionable. While the project engineer is the arbiter of all disputes, Black & Veatch would not settle any dispute concerning claims based on issues of delay. Meanwhile, more than six months passed before the City officially hired Black & Veatch as the project engineer.

Thus, even though the defendant accurately points out that the plaintiff recognized Black & Veatch for some purposes, the evidence shows that Black & Veatch was not recognized by the plaintiff as the project engineer for purposes of resolution of disputes. The fact that the plaintiff chose to deal with Black & Veatch proves no more than the likelihood that the plaintiff found it easier to deal with an engineering firm rather than a municipality who may have been unfamiliar [*13] with all the aspects involved in a rather complex construction contract.

Finally, the fact that the plaintiff sought payment of the amount that Black & Veatch had determined was due as a final payment under the terms of the contract does not necessarily mean that the plaintiff waived any and all objections to Black & Veatch as an engineer. The money that the plaintiff attempted to collect consisted of undisputed amounts of which approximately $ 139,000 was retainage which were awarded well after the initiation of the present trial and did not constitute a waiver.

Accordingly, the court finds that the defendant's special defenses do not bar the court from examining the plaintiff's claims against West Haven.

The court will now discuss the various items that the plaintiff argues it is entitled to. The court will address the individual items in the order presented in the attached appendix to this memorandum, as presented by the plaintiff and as referred to by the parties in their respective briefs.

I. Base Contract

Line Item 7 - Force main Tap Sheeting

Line Item 14 - Force main Tap Restraint

The court finds that as to these two claims of the plaintiff that [*14] the plaintiff is entitled to recover $ 10,485. Due to unforeseen circumstances these items were eliminated from the contract by the defendant. The plaintiff is nonetheless entitled to the profit and overhead as a part of the bid accepted by the defendant. The plaintiff has properly credited the defendant with the actual net cost of the work which they were not required to perform. It is noteworthy that the City on prior occasions during the performance of the contract adopted this procedure in dealing with similar situations. See CO # 1, P. Ex. 60 - "Delete Force Line Stop/Tapping."

Line Item 22 - New Monorail with Structural Steel

As to this item, the court finds that the contract specifically places the burden on Daly to provide the necessary protection for all work materials and equipment. (P. Ex. 3(b), Sec. 6.20; T. 3/31/ 99 P. 165 - 3/10/99 p. 19.) Even though the plaintiff may have been locked out for a period of time, the court feels that necessary precautions should have been taken prior to the lockout. Moreover, there is conflicting evidence as to whether the specified item was actually ever delivered to the plaintiff. The plaintiff's claim is therefore denied. [*15]

Line Item 36 - Sewage Pumps

In regard to the sewage pumps referred to in Line Item 36, the evidence shows that certain parts of the pumps were never properly installed by Daly, thus causing the vibration problem that the defendant had to remedy. Because of this, the court finds that Daly is not due any additional sums for work associated with the Line Item. D. Ex. 132.

Line Item 39 - General Electric Work

The court finds that the plaintiff has not shown that it is entitled to receive additional money for general electric work allegedly completed prior to termination. (See T. 3/31/99, p. 106, D. Ex. 56 p. 4, 57 p. 5-6.)

Line Item 41 and 42 -

Adjustable Frequency Drive

Power Control System

The court finds for Daly as to Line Item 41 (Adjustable Frequency drive) and 42 (Power Control System) for an additional amount of $ 10,000. In regard to Line Item 41 and 42, the evidence shows that these items were specifically completed by Daly, entitling the contractor for full credit for the services performed. (See T. 3/11/99, p. 121-123.)

Line Item 46

Concerning the additional amount of $ 1,000 reflected in Line Item 46, the evidence shows that the required work [*16] was necessary to repair damage caused by another contractor of the city. While the contract states that Daly is required to perform all necessary paint work, the court reads this provision as requiring that Daly be responsible only for painting done in connection with work performed by Daly. It cannot be seriously contended that Daly would have agreed to be responsible for additional painting or repairs caused by the neglect or failure of other contractors of the city. (See T. 3/11/99, p. 124.)

II. Change Order # 1

Change Order # 1 is the change order allowing the plaintiff to construct a new force main after the discovery that the existing one was made of asbestos. The plaintiff, under Line Item 3 (Labor Supervision) and 15 (30" DIP 1412LF) of CO # 1, seeks additional costs incurred by the plaintiff after delays forced Daly to hire a new subcontractor for the installation of the remainder of the force main.

The court finds that Daly is not entitled to these additional costs. The evidence shows that at least part of the delays that led to the departure of the original subcontractor were caused through the fault of Daly. Specifically, while negotiating with the City as to [*17] additional claims previously incurred, Daly refused to complete the installation of the last 21 feet of linear pipe necessary for the completion of the force main. Daly did so even though the contract specifically stated that work would continue while disputed claims between the parties were being addressed. (P. Ex. 3(b) G.C.12 Sec. 6.29.) By the time Daly was ready to resume work on the remaining parts of the force main the original subcontractor had already vacated the job because of delay in payment requiring that Daly hire another more expensive

subcontractor. Thus, these additional costs incurred in the installation of the force main were caused through the fault of Daly.

### III. Change Order Requests to Change Order No. 1

The plaintiff seeks a payment of $ 25,775 (COR # 9) as a result of downtime incurred by its subcontractor New England Railroad (NER) while the subcontractor was installing the force main. The defendant argues that any and all delays incurred during the installation of the force main were previously compensated by CO # 6. Furthermore, the City argues that Daly has not yet paid NER the $ 25,775 amount and thus cannot recover from West Haven.

The court [*18] will first address the impact of CO # 6 on the claim presently set forth. As discussed above in relation to the defendant's special defense of accord and satisfaction, CO # 6 does not contemplate a settlement of all future costs. Rather, it is a settlement for all costs specifically discussed and enumerated therein. At the time that CO # 6 was executed, Daly was already aware of the claim being submitted by NER. The absence of any mention of this claim in the change order leads the court to believe that the plaintiff did not contemplate settling this claim as part of CO # 6.

The court also feels that Daly has standing to seek the claim even though NER has not yet technically been paid. In this respect, the court does not find the authority cited by the defendant for the proposition stating otherwise to be persuasive. The Wexler case, *Wexler Const. Co. v. Housing Authority, 149 Conn. 602, 183 A.2d 262*, appears to the court to apply to situations where a subcontractor has a direct claim against an owner and not one directly related to the general contractor. As to this claim the record supports the claim of the plaintiff that it has an outstanding obligation to [*19] that supplier.

#### Change Order Request No. 9

In regard to the claim itself, the court finds that there is ample evidence to support the fact that West Haven caused a substantial portion of the delay that led to the downtime experienced by NER. Specifically, the defendant's failure to timely get a permit from the Department of Environmental Protection (T. 4/1/99 p. 3-9) and the additional delays incurred in West Haven's attempts to videotape two residential homes adjacent to the force main added a substantial period to the completion of the project and resulted in NER being unable to work on its assigned task. (Plaintiff's Ex. 68.)

However, the court also finds that Daly contributed to some of the downtime experienced by NER. Daly's contribution to the delay stems from its difficulty in dealing with certain subcontractors and suppliers which, in turn, caused NER additional periods of inactivity.

Thus, there appears to be conflicting evidence as to the reason for the delays culminating in NER's downtime. The court, accordingly, finds that both parties are responsible for the delays causing NER's downtime. Ultimately, the court believes that it is fair and reasonable to allocate [*20] 50% of the delay/downtime to each party. The plaintiff, is entitled to $ 12,887 of the $ 25,775 originally sought under COR # 9.

#### Change Order Requests - Nos. 27, 35 and 44

As to COR Numbers 27, 35 and 44, this court cannot conclude with any reasonable certainty the amount of overhead to which Daly is entitled. Though the court has previously granted a portion of Daly's claims (e.g. COR # 9), the court has also denied certain Daly requests such as Line Items # 3 and # 15 to CO # 1. Both parties have treated COR Numbers 27, 35 and 44 singularly and have not specified which change order applies to any portion of damages found in favor of Daly. The court, accordingly, finds that Daly has failed to prove its burden as to the claims for COR Numbers 27, 35 and 44.

#### Change Order No. 45 - Additional Earth Work

The court finds that Daly is not entitled to COR # 45 (additional earth work). As previously discussed in relation to Line Items # 3 and # 15, the plaintiff is bound by the previously agreed sum of $ 60 per linear foot for installation of the force main. The court finds that the allegedly additional earth work was included in the contemplated costs of the previous agreement. [*21]

### IV. Outstanding Change Order Requests to Base Contract.

Daly seeks $ 429,656.21 in outstanding claims for work additionally performed under the base contract. The majority of this amount consists of plaintiff's COR # 8, which seeks $ 382,153.71 for additional costs as a result of bypass pumping and the costs associated therewith. In discussing COR # 8, it is helpful to first set out the factual background as heard by the court during trial.

As part of the project for the City of West Haven, the plaintiff agreed to install a bypass pumping system which would serve the City while the plaintiff constructed the new main pump station. After numerous delays resulting in large part from the need to construct a new iron force main, Daly projected that the bypass pumping would remain in effect for nine weeks and would be taken off-line on or about August 10, 1995. However, prior to the start of Daly's scheduled replacement of the pumps and the start of the temporary bypass pumping, it was determined by the city (following the failure of one of the existing pumps) that the two remaining pumps were in further and immediate danger of failing. The City, accordingly, requested that the [*22] bypass pumping be started immediately.

As it turned out, the temporary bypass pumping was in place for 25 weeks, a period substantially longer than contemplated by the plaintiff. The evidence gathered at trial shows that the 25-week period was a result of numerous factors which will be discussed below. The plaintiff claims that it is entitled to compensation to cover the 16 additional weeks of bypass pumping than anticipated. The defendant, however, argues that under the contract, the plaintiff is responsible for all of the bypass pumping during the project. The defendant, moreover, claims that bypass pumping was an integral part of the overall base contract price and was not itemized as having a specific value. Accordingly, the defendant argues that the plaintiff is not entitled to claim that it incurred additional costs.

The court finds that the evidence shows that the original cost contemplated for the bypass pumping (see P. Ex. 6 Schedule) would have been some $ 43,500. While this item is not specifically set out in the contract and appears to be included in the overall cost of the contract, the court finds that the evidence demonstrates that the furnishing of the bypass [*23] pumping figured prominently in arriving at the contract price and that both parties were aware of this fact. The court also finds that the evidence favors the presumption that the $ 43,500 figure was based on certain criteria, e.g. diesel pumps running for nine weeks, which were rendered useless because of the urgent attention demanded by the City once the former pumps started to fail.

Thus, the court finds that Daly is entitled to recover the additional costs incurred as a result of the emergency bypass pumping. n1 The defendant's "but-for" argument that the emergency situation would never have arisen had Daly not delayed several months while attempting to settle outstanding delay costs is not persuasive. Using the logic implicit in the same "but-for" argument, the need for emergency pumping would have never occurred, if, for instance, the plaintiff had not been contracted to replace the asbestos force main. That is, the imminent failure of the then-existing pumping system was something that was never planned for or considered by either party when contemplating the total project. The intention of the parties to a contract is to be determined by a fair and reasonable construction [*24] of the language used interpreted in light of the situation of the parties, the circumstances connected with the transaction, the motives of the parties and the purpose which they sought to accomplish. *E&F Construction Co. v. Rissil Construction Associates, Inc., 181 Conn. 317, 320, 435 A.2d 343 (1980).* Thus, while the plaintiff may have been responsible for all bypass pumping during the project, it would be unreasonable to conclude that the plaintiff would have agreed to be responsible for any bypass pumping outside of the factors and scope contemplated in the original project.

> n1 The evidence shows that the emergency bypass pumping necessitated substantial additional costs as a result of the need to use electrical pumps rather than diesel pumps, the costs for sound enclosures, etc. See *P. Ex. 64, T.4/1/ 99 P. 18-24.*

It is the court's opinion, therefore, that the plaintiff should be awarded damages to cover additional expenses incurred through the need for emergency bypass pumping. [*25] However, any delays caused through the fault of the plaintiff must be credited against the amount sought for the extended period of bypass pumping. With this in mind, the following is the court's calculation of this claim.

7

According to the evidence, the plaintiff expended $ 421,364.78 for the bypass pumping. (P. Ex. 169A, p. 2.) Since the bypass pumping lasted a total of 176 days, the daily expenditure for the bypass pumping amounts to (rounded to the nearest figure) $ 2394. Subtracting the emergency component of $ 39,200, [n2] the plaintiff seeks to recover $ 382,165.

>   [n2] The emergency component of $ 39,200 has been acknowledged by both parties.

APPENDIX A

I. BASE CONTRACT

Line Item 7-Force main Tap Sheeting

Line Item 14-Force main Tap Restraint

Line Item 22-New Monorail with Structural Steel

Line Item 36-Sewage Pumps

Line Item 39-General Electric Work

Line Item 41-Adjustable Frequency Drive

Line Item 42-Power Control System

Line Item 44-Generator

Line Item 46-Painting

II. CHANGE ORDER NO. 1

Line Item 3-Labor/Supervision

Line Item 15-30" DIP 1412LF

III. CHANGE ORDER REQUESTS TO CHANGE ORDER NO 1

COR # 9 - Downtime for New England Railroad

COR # 27 - Increase in Overhead & Profit

COR # 35 - Extra Overhead and Profit

COR # 44 - Extra Overhead and Profit

COR # 45 - Additional Earth Work

IV. OUTSTANDING CHANGE ORDER REQUESTS TO BASE CONTRACT

COR # 8 - Cost of Bypass Pumping and Costs Associated with Bypass Pumping

COR # 15 - Additional Ground

COR # 17 - Replace Conductors

COR # 18 - Battery Replacement

COR # 19 - Modify VFD Room

COR # 20 - Missing Door, Hardware and Masonry

COR # 21 - Concrete Cap for Storm Drain Manhole

COR # 22 - Check Valves Concrete Supports

COR # 26 - Replace Missing Monorail

COR # 28 - Extended 11/1995-96 Field Costs and other extraordinary costs

V. CLAIMS

A. Delay Costs

Costs for Extended Indirect Home Office Overhead

VI. LOST BUSINESS OPPORTUNITY AND BUSINESS DESTRUCTION

A. Lost Bonding Capacity/Profit Opportunities

B. Interest Cost Calculation

[*26]

Of the 176 days needed to complete the bypass pumping, the court finds that the plaintiff is not entitled to 92 days of that total. Regarding the 92 days, the court finds that the plaintiff has failed to carry its burden of showing that the City solely caused the delays. The 92 days can be broken down into three separate periods.

The first, lasting some 28 days, occurred, at least in part, as a result of the plaintiff's failure to mobilize its work force, the plaintiff's difficulties with subcontractors and the plaintiff's problems in supplying the necessary equipment. (See p. 11, West Haven Reply Brief and exhibits noted therein.)

The second period of delay, consisting of 23 days, stems from the defendant's demand that the plaintiff replace certain conductors previously installed. Some background is helpful to the discussion of this delay. The contract specified that the plaintiff install a specific brand of conductor, the XHHW. However, it was eventually discovered that the XHHW was no longer available due to the fact that the manufacturer had discontinued that product. Accordingly, the plaintiff sought to replace (and ultimately did) the conductor with a similar conductor [*27] known as the THHN/THWN. After the THHN/THWN conductors had been installed, the defendant, through its building official, Frank Gladwin, discovered that a nonspecified conductor had been installed and the City then demanded that the plaintiff remove the THHN/THWN conductors and, instead install XHHW-2 conductors which the City felt was the "or equal" substitute.

As a result of the need to re-install the XHHW-2 conductors, the plaintiff incurred a delay of 23 days. Daly now argues that it should be reimbursed for this delay period (during which the bypass pumping continued to run) because the THHN/THWN conductors were a proper substitute which were, moreover, approved by the original engineer, Cascio-Bechir.

The court finds that the evidence at trial does not support Daly's claim. For one, the evidence shows that the THHN/THWN conductor was not an equal substitute for the original XHHW. While the two conductors had similar propensities in regards to heat, an expert for the defendant testified that the former was not as resilient to moisture as the latter and was thus improper when one considered its intended use in an area susceptible to flooding. (See T. 4/15/99, p. 103-104.) [*28] Furthermore, the court is not convinced that Daly actually received previous approval to substitute THHN/THWN. The evidence cited by Daly as constituting such approval claimed to appear in CO # 4 only shows a

9

vague reference to THHN/THWN and does not constitute an outright approval of the THHN/THWN as a substitute. The court finds that the use of THHN/THWN was improper and thus any delays in remediating that problem were not the fault of the defendant City. Accordingly, the plaintiff is not entitled to recover bypass pumping costs for this 23 day period.

The final period of time for which the plaintiff has not proven that the bypass pumping delays were caused by the defendant involves a 41 day period from June 20, 1995 to July 31, 1995. During this period the plaintiff was not ready to proceed with demolition work on the existing plant structure. Whether this was a result of the plaintiff's failure to have adequate supplies or workforce ready, or whether this delay was caused in part by Daly's previous refusal to do work pending the resolution of certain delays claims is not clear. The court does not find that the evidence shows that the defendant was completely responsible for [*29] this period of inactivity.

A further note as to the 41-day period of inactivity; during this stretch of time, the plaintiff was originally instructed not to proceed with the project for a period of 15 days as a result of the City's desire not to interfere with the World Special Olympics which were being held concurrently in the New Haven area. Although the evidence suggests that the defendant subsequently changed its mind as to this directive, this court finds that Daly would have reasonably been entitled not to schedule any work during this time period. Accordingly, the court finds that out of the plaintiff's inactivity of 41 days, the defendant was responsible for 15 days which should be credited.

Thus, the court finds the damages resulting from the extended period of bypass pumping operations necessitated by the emergency bypass requirements as follows: Of the additional $ 382,165 expended by the plaintiff, the plaintiff is responsible for 92 days of delay, which at a daily rate of $ 2394 equals $ 220,248. Crediting the plaintiff an additional $ 35,910 (15 days at daily rate of $ 2394) for any shut down time resulting from the Special Olympics, the court finds that the [*30] plaintiff is entitled to $ 197,827 for additional costs associated with the emergency bypass pumping.

Change Order Request No. 15

The plaintiff seeks $ 1412 as a result of additional grounding supposedly done at the behest of the City's building official, Frank Gladwin. The court denies this claim. The evidence (D. Ex. 104) shows that the additional grounding was brought about as a matter of convenience by Daly's electrical subcontractor C & H and that Gladwin merely concurred in C & H's request.

Change Order Request No. 17

Pursuant to COR # 17, the plaintiff next seeks damages for money expended as a result of the need to replace the previously installed conductors with ones specified in the contract by the defendant City. As already discussed in relation to the additional costs incurred by the extended bypass pumping costs, the plaintiff is not entitled to recovery for additional expenses resulting from the replacement of the conductors. Accordingly, the court denies the claim for COR # 17.

Change Order Request No's 18, 20 and 26

The plaintiff also seeks damages pursuant to COR # 18 (battery replacement), # 20 (missing door, hardware and masonry) and # 26 (replace [*31] missing monorail). Daly argues that it had to assume the costs of replacing these items which were allegedly lost or damaged while Daly was locked off-site by the City. As previously referred to in the context of the monorail hoist, the court finds that the contractor was responsible for the care and maintenance of all its equipment and cannot seek reimbursement for the replacement items. While Daly may have been temporarily locked off-site, there appears no reason why Daly could not have secured the equipment and supplies prior to the lockout. The court, accordingly, finds that Daly is not entitled to CORs # 18, # 20 and # 26.

Change Order Request No. 19

Next, the court will address COR # 19, which reflects the cost incurred by Daly in modifying the room housing the variable frequency drives (VFD) after it was discovered that the VFD mechanisms would not properly fit in the room if constructed according to plans. The city argues that Daly is not entitled to the costs associated with the modification because the need to modify the room was specifically caused by Daly's use of drives not called for in the contract. It appears, however, that Daly did receive permission from the [*32] former engineer, Cascio-Bechir, to proceed with the

10

modification. As Cascio-Bechir was terminated soon afterwards, it appears that the permission for the modification was never properly recorded in writing. Moreover, the evidence from trial shows that the room would have to have been modified even if Daly used the drives specified in the contract. See T. 4/7/99, p. 80. Thus, the court finds that the need to modify the VFD room was caused by an error in the original contract drawings. As this is the responsibility of the owner, the court finds that Daly is entitled to the costs expended in modifying the room in order to proceed with the project. This amount is found to be $ 4758.27.

Change Order Request No. 21

COR # 21 concerns $ 1,607.49 expended by Daly in installing a concrete cap for a storm drain manhole referred throughout trial as the "snake pit." The City argues that such work was outside of the scope of the contract and was never authorized by it.

The court finds that Daly is entitled to be reimbursed for any work done relating to the "snake pit." While the contract does not reflect any work to be performed in connection with the "snake pit," the court finds that [*33] such work was unanticipated by either party at the time the contract was made. Furthermore, given the safety hazards posed by the open pit, it is reasonable that Daly would conclude that the furnishing of a concrete cover could be a responsibility of the contractor in protecting its workers and equipment. The evidence, moreover, shows that the engineer Cascio-Bechir gave verbal authorization for the work to proceed in remedying this safety hazard. (P. Ex. 97.) See *Kelly v. Anderson Ridge Assoc., 1994 Conn. Super. LEXIS 2048*, J.D. Danbury Docket Number 299885, (8/15/94, Flynn, J.). The court finds therefore that Daly is entitled to the amount of $ 1,607.49 for costs associated with COR # 21.

Change Order Request No. 22

The court also finds that Daly is entitled to an additional $ 2,176.45 for costs expended in the installation of concrete supports for the check valves. The concrete supports, not shown on the original drawings (P. Exhs. 4 and 100), were installed at the urging of the manufacturer of the check valves. (T. 3/25/99 p. 34.) The court, accordingly, finds that such work, not contemplated by the contract, was additionally necessary and should properly be paid for by the City.

Change Order Request [*34] No. 28

The final disputed item under the outstanding change order requests to the base contracts, consists of extended field costs and other "hard costs" that the plaintiff allegedly expended from November 1, 1995 through May of 1996. The court finds that the plaintiff has not proven that it is entitled to these additional costs. The delay in finishing the contract and the resumption of work in the spring of 1996 stemmed from a myriad of factors including the plaintiff's necessary overhaul of the improper conductors. Thus, any final delays were caused in part by Daly and the court, accordingly, finds that Daly has failed to demonstrate that City was directly responsible for all of the hard costs incurred by Daly through May of 1996.

V. Delay Claims

Several cases in Connecticut and elsewhere have considered the question of computing damages attributable to home office costs of a construction company engaged in multiple projects on a simultaneous basis. A formula was devised to attempt to allocate such expenses to particular projects. This became popularly known as the "Eichleay formula." The formula was adopted but not specifically labeled as such in *Southern New England Contracting Co. v. State, 165 Conn. 644, 345 A.2d 550 (1974)*. [*35] "Home office overhead is a well-recognized item of damage for delay and the plaintiff would be entitled to recover for it . . ." *Southern New England Contracting Co. v. State, supra, 165 Conn. 663*. "While such an element of damage can never be proven with mathematical precision, it is standard accounting practice to attribute main office expense to various company operations on some fair basis." *Id.*

Daly, using the Eichleay formula, has calculated its costs for extended indirect home office overhead throughout the project to be $ 349,151.00. This overhead covers the delay period, 677 days, from August 1, 1994 to June 8, 1996. (See P. Ex. 171.) Accordingly, the daily overhead costs for this period amount to $ 515.73 per diem.

The court finds that Daly is entitled to overhead costs. For one, the court, as has been previously discussed, has found that the defendant's special defenses of accord and satisfaction do not bar the plaintiff from seeking associated overhead.

11

Such overhead costs were not included in the itemization of delay costs under change order # 6 and remain viable and outstanding damages for which Daly may recover.

Furthermore, the [*36] court finds that the City is responsible for a substantial portion of delays encountered throughout the project. The delays for which the City is responsible include the discovery of the underground structure, the delays associated with the force main not encompassed in change order # 6, the emergency bypass pumping and the delays stemming from the Special Olympics. On the basis of these delays, the court finds that the City is responsible for compensating Daly for overhead costs. The court further finds that the Eichleay formula used by Daly in calculating the home office overhead is an appropriate method for showing Daly's overhead costs in accordance with *Southern New England*, cited *supra*.

The plaintiff has calculated the overhead costs to be $ 349,151. However, as the court has previously concluded that Daly is responsible for 77 days of delay (see discussion above), the court will reduce the overhead costs accordingly. At the per diem rate of $ 515.73, Daly is responsible for $ 39,732.

The court, therefore, finds that Daly is entitled to $ 309,419 in home office overhead costs. This figure is not contemplated to be a precise calculation of the parties' rights [*37] and liability, but rather a general allocation of damages as determined by an overview of the evidence. The court notes that it is incapable of analyzing the voluminous amount of evidence so precisely as to determine a minute resolution of the numerous arguments of the respective parties as on a day by day basis.

### VI. Lost Business Opportunity and Business Destruction

The plaintiff also seeks $ 1,938,091 in lost bonding capacity which resulted in lost profit opportunity and an additional $ 254,373 in interest cost calculations. Daly relies on the testimony of its expert accountant, Anthony Scillia, in arriving at these figures. (See P. Ex. 170, 171.) The testimony presented by Scillia and also by Jan Dembinski, the president of M.J. Daly and Sons, Inc. indicates that the plaintiff's bonding company declined to provide further bonds to the plaintiff as a result of the West Haven project. Scillia and Dembinski also testified that, because of the lost bonding capacity, Daly was subsequently unable to form a joint venture once it had been selected as the successful bidder on a project in Stamford/Greenwich, CT.

While this evidence was only mentioned in passing by the defendant [*38] in its brief, it is a general principle that "the trial court is not bound by the uncontradicted testimony of any witness." *Bieluch v. Bieluch, 199 Conn. 550, 555, 509 A.2d 8 (1996)*. In the present case, the court finds that the plaintiff has not met its burden of proving that the actions of the City caused Daly the claimed damages stemming from lost profit and lost bonding capacity. (See T. April 8, 1999 p. 61, 62, where Mr. Scillia testifying for the plaintiff couldn't recall at that time of any jobs that were lost by the plaintiff.) The court finds that the plaintiff has failed to demonstrate by a preponderance of evidence that they are entitled to the amount of damages they seek. In particular, the court finds that Daly has not shown with a reasonably ascertainable specificity that it lost jobs as a result of the lost bonding capacity and any claimed damages resulting therefrom. The court, accordingly, does not find that Daly is entitled to damages stemming from a loss of bonding capacity.

### VII. Tort Claims

Having found that Daly is entitled to recover damages arising out of the contract, the court will only briefly address the plaintiff's remaining tort claims [*39] of breach of good faith and fair dealing; negligence; negligent misrepresentation and intentional misrepresentation. As to these claims, the court finds that there is no clear and compelling evidence to show or suggest that the City acted in bad faith toward Daly. Rather, the evidence shows that both parties, faced with a contract complicated by unforeseen contingencies, acted in a "give and take" manner that was designed to effectuate and move along the performance of the contract. Thus, the court feels that evidence offered by Daly to suggest bad faith (e.g., the City preparing a $ 400,000 check to Daly and then rescinding that check) is nothing more than strategic contractual maneuvering based on counsel's advice. The court does not see how, in the context of the whole project and the difficulties experienced by both sides, such conduct was indicative of bad faith or fraud. The court, accordingly, does not find in Daly's favor as to its tort claims.

### Counterclaim

The defendant in addition to its answer and special defenses has put forth a counterclaim demanding enforcement of the contract in accordance with the award determined by the engineer. Inasmuch as the court by its [*40] foregoing findings as to the various claims of the plaintiff has determined that the counterclaim is without merit, the court, accordingly, finds the issues in favor of the plaintiff.

Conclusion

The court concludes from the foregoing that the plaintiff is entitled to statutory interest pursuant to *37-3a* C.G.S. The court finds that the date upon which the wrongful detention began was on June 13, 1996. This date has been selected as the date on which all ongoing relations between the parties ended and all attempts to amicably arrive at agreements as to disputed sums terminated. Prior to this time there had been some give and take to resolve their disputes as reflected by various change order requests but the termination of the contract ended these efforts.

It is the court's finding that the determination of money that this court has found due and owing became wrongful at the time of termination, June 13, 1996 and interest is therefore due from that time to the date of this judgment. *Foley v. Huntington Company, 42 Conn. App. 712, 739 682 A.2d 1026 (1996).* See also *Northrop v. Allstate Insurance Company, 247 Conn. 242, 254, 720 A.2d 879 (1998).* [*41]

Because of the various times that disputed sums might have technically become due and payable through the course of the contract, the court concludes that selecting the date of termination as a due and owing date would appear to meet the demands of justice. *Chmielewski v. Aetna Casualty & Surety Co., 218 Conn. 646, 676, 591 A.2d 101 (1991).*

The interest found to be due under 37-3a from June 13, 1996 to the date of this judgment is $ 178,878.81: 1199 days from June 13, 1996 to the date of this judgment, September 24, 1999, at a per diem rate of $ 149.19.

In summary, the court finds $ 550,160.21 damages. From this, $ 5,620.00 is deducted as a credit due defendant on Change Order # 6 (see Plaintiff's brief 6/18/99, Appendix B, p. 4).

The sum total of damages and interest is therefore $ 723,419.02.

BY THE COURT,

George W. Ripley III

Judge Trial Referee

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed this 17th day of February, 2004, to the following counsel of record:

Mark Block, Esq.
O'Brien, Shafner, Stuart, Kelly & Morris, P.C.
138 Main Street
Norwich, CT  06360

_____
Christopher M. Reeves

LAW OFFICES • FUREY, DONOVAN, EDDY, KOCSIS, TRACY & DALY, P.C.
43 BELLEVUE AVENUE • P. O. BOX 670 • BRISTOL, CT. 06010-0670 • (203) 589-4343 • JURIS NO. 21150